UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

          Plaintiff,

          v.                                 Docket No. 15 CR 00019 (KPF)

NATISHA APONTE, et al.

          Defendants.
------------------------------------------------------X

## DEFENDANT NATISHA APONTE'S OMNIBUS MOTION

John Rapawy, Esq.
90 Broad Street, 15th Floor
New York, New York 10004
Phone (212) 668-8400

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| NOTICE OF MOTION |  | 4 |
| MEMORANDUM OF POINTS AND AUTHORITIES |  | 5 |
| Statement of Facts |  | 5 |
| (I) | Motion for Severance and Separate Trial | 6 |
| (II) | Motion to Suppress Evidence Obtained from the Warrantless Search Of Natisha Aponte in Brooklyn, New York on December 11, 2014 | 19 |
| (III) | Motion to Suppress Evidence Obtained from the Warrantless Search Of Natisha Aponte at JFK Airport on July 15, 2012 | 22 |
| (IV) | Motion to Incorporate and Adopt Motions of Co-Defendants and Leave to Make Further Motions | 24 |
| | Conclusion | 25 |
| AFFIRMATION IN SUPPORT |  | 26 |
| TABLE OF AUTHORITIES |  | 28 |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

(HONORABLE KATHERINE POLK FAILLA)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 15 CR 00019 (KPF) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OF POINTS AND** |
| NATISHA APONTE, *et al.*, | ) | **AUTHORITIES IN SUPPORT OF** |
| | ) | **DEFENDANT'S MOTIONS** |
| Defendants. | ) | |
| | ) | |

## STATEMENT OF FACTS

Natisha Aponte ("Aponte"), along with co-defendants Roman Kitroser, Jessy Castillo and Ronel Pierre, was arrested pursuant to a Complaint prepared by Special Agent Anthony Scotto of the Drug Enforcement Administration dated December 12, 2014 (the "Complaint").

Aponte was subsequently charged in Counts One and Two of a two count Indictment filed January 13, 2015 (the "Indictment"). Count One charges that Aponte, along with co-defendants Roman Kitroser ("Kitroser"), Jessy Castillo ("Castillo"), Ronel Pierre ("Pierre") and others, conspired to distribute and possess with the intent to distribute a controlled substance from in or about December 2013 through on or about December 12, 2014 in violation of 21 U.S.C. §841(a)(1). Count Two charges that Aponte, along with Kitroser and others knowingly did use and carry firearms, and in furtherance of Count One, did possess firearms and did aid, abet the use, carrying, and possession thereof, which included machineguns, silencers and destructive devices in or about December 2014 in violation of 18 U.S.C.

5

§924(c)(1)(A) & (B)(ii) and (2).

Aponte entered a plea of Not Guilty to the charges before this Court and remains detained without bail.

## POINT I

### MOTION FOR SEVERANCE AND SEPARATE TRIAL

This Court possesses "*discretion to grant a defendant's request for severance under Rule 14 if it appears that the joinder with other defendants will result in undue prejudice.*" United States v. DeVillio, 983 F.2d 1185, 1192 (2d Cir. 1993).

Consistent with the foregoing, Rule 14(a) of the Federal Rules of Criminal Procedure provides:

"*If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.*"

It is thus completely within the discretion of the Court to grant severance under Rule 14(a) and such action is reviewable only for abuse of discretion. United States v. Werner, 620 F.2d 922 (E.D.N.Y. 1980).

The Supreme Court held in Zafiro v. United States, 506 U.S. 534, 539 (1993) that severance should be granted "*if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.*" According to the Court "[s]*uch a risk might occur when evidence that*

6

*the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.... When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened".* This assessment of the risk of prejudice is a fact specific inquiry and depends on the circumstances of each particular case.

In the seminal case of United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987), the Court identified the relevant factors to be taken into consideration in determining whether the prejudice of a joint trial rises to the level of justifying a severance as follows:

*"[T]he number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant."*

Defense counsel respectfully submits that the critical factors for consideration in the instant matter are (1) the estimated length of the trial; (2) disparities in the amount or type of proof offered against the defendants; (3) disparities in the degrees of involvement by defendants in the overall scheme; (4) possible conflict between various defense theories or trial strategies and (5) prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

7

—

(1)     **The Estimated Length of Trial**: Given the length of time co-defendant Kitroser is alleged to have been the target of DEA investigation ("*since approximately 2012, the DEA has been investigating Roman Kitroser, the defendant, for narcotics trafficking*" - Complaint §7) as well as the voluminous amount of discovery produced to date[1], we estimate the length of a consolidated trial of all four co-defendants at two months. Conversely, we believe that the trial of Natisha Aponte would likely last only 5 to 7 days.

(2)     **Disparities in the Amount or Type of Proof Offered Against the Defendants**:

The ongoing consolidation of these four defendants together in one trial will require the introduction of voluminous amounts of evidence – a substantial amount of which will not apply to Aponte.

As referenced in §7 of the Complaint, co-defendant Kitroser has been the target of a DEA investigation since 2012 – a period of approximately 3 years prior to the instant arrests. A review of the discovery produced by the Government to date makes clear that the quantity of evidence against Aponte adduced during the course of the Government's investigation absolutely pales in comparison to that which exists pertaining to co-defendant Kitroser.

Moreover, the type of evidence to be offered against Aponte stands in stark contrast to that which exists relating to co-defendant Kitroser. The Government's investigation of Kitroser includes, without limitation, wiretaps of his cellphones (including multiple recorded conversations in which shipments of controlled substances were discussed with an individual the Government has alleged to be a member of a notorious Mexican drug cartel), cell tower tracking of his cellphones, GPS location tracking of his vehicles as well as active video surveillance – all of which ultimately culminated in Kitroser and Pierre

---

[1] The Government has to date produced copious amounts of discovery on January 16, 2015, February 17, 2015, March 3, 2015, March 11, 2015, April 2, 2015, April 6, 2015, April 15, 2015, April 22, 2015 and May 8, 2015.

being seized by law enforcement during the course of an alleged exchange of two kilograms of cocaine for approximately $68,000 in cash within a parked car on a public street.

No such evidence exists against Aponte. For purposes of clarity and avoidance of doubt, Aponte's personal cellphone was not tapped, her personal vehicle untracked and she has never been found to be in actual personal possession of any of the controlled substances identified in the Indictment.

Thus, both the sheer volume of the documents and testimony as well as the nature of the proofs the Government intends to introduce pertaining to its three year investigation will undoubtedly confuse the jury. This will necessarily result in a substantial risk Aponte will be convicted based on the Government's theme and theory against Kitroser as opposed to the facts specific to her own alleged acts.

(3)     **Disparities in the Degrees of Involvement by Defendants in the Overall Scheme:**

As detailed in the preceding discussion regarding existing disparities in the amount and type of proof offered against the defendants, Aponte's rights will be severely and unfairly prejudiced if she is forced to stand trial with co-defendant Kitroser. These concerns however become compounded exponentially when one considers factors specific to this case as set forth in the Complaint which ultimately led to the Indictment:

> *"[o]n approximately 20 different days between in or about November 2014 and in or about December 2014, I and other law enforcement agents have conducted surveillance of Kitroser in particular, Kitroser's activities in the vicinity of a residential building in Brooklyn (the "Brooklyn Residence") and a residential building in Manhattan (the "Manhattan residence")"*

(Complaint §7)

9

Indeed, as can be elicited from a dissection and comparison of Kitroser and Aponte's respective acts in the Complaint allegedly undertaken in furtherance of the conspiracy, the Government's comprehensive surveillance places the disparity in the degree of involvement by these two defendants in the overall scheme into even sharper focus:

### Roman Kitroser

"8.     On or about November 20, 2014, I and other law enforcement agents conducted surveillance of ROMAN KITROSER, the defendant. During that surveillance, we observed, among other things, the following:

        a.      KITROSER exited the Brooklyn Residence carrying a large cardboard box (the "Box"). KITROSER put the Box into the trunk of a truck (the "Truck").

        b.      KITROSER drove to a package store in Brooklyn, New York (the "Mail Station"). KITROSER parked the Truck in front of the Mail Station. KITROSER then carried the Box into the Mail Station. KITROSER emerged shortly thereafter without the Box.

        c.      Law enforcement agents thereafter entered the Mail Station and identified the Box. A certified narcotics detection canine inspected the Box and made a positive alert for the presence of narcotics.

        9.      On or about November 20, 2014, the Honorable Ronald L. Ellis, United States Magistrate Judge for the Southern District of New York, signed a search warrant for the Box. I and other law enforcement agents executed the search warrant and found, among other things, a speaker that contained a hidden compartment. Within the hidden compartment was approximately $300,000 in U.S. currency.

11.     On or about December 10, 2014, I and other law enforcement agents conducted surveillance of ROMAN KITROSER, the defendant, in the vicinity of both the Brooklyn Residence and the Manhattan Residence, and reviewed security camera footage from the Manhattan Residence. From speaking with some of the law enforcement agents and from my review of the security camera footage, I have learned, among other things, the following:

a.      KITROSER drove a car (the "Car") from the Brooklyn Residence to a package store in Manhattan (the "Package Store"). KITROSER picked up two large cardboard boxes from the Package Store, and put them in the Car.

b.      KITROSER drove the Car to the Manhattan Residence. KITROSER parked the Car in the parking garage for the Manhattan Residence.

c.      Directly behind KITROSER's Car as he entered the parking garage was a vehicle driven by JESSY CASTILLO, the defendant.

d.      KITROSER removed the two large cardboard boxes from the trunk of the Car. KITROSER placed the cardboard boxes on a dolly.

e.      CASTILLO removed a large cardboard box from his vehicle and placed that box on top of the two large cardboard boxes on the dolly.

f.      KITROSER and CASTILLO embraced.

12. On or about December 11, 2014, law enforcement agents conducted surveillance of ROMAN KITROSER, the defendant, in the vicinity of the Brooklyn Residence. I have spoken with some of the agents, who told me, in substance and in part, the following:

a.      KITROSER entered the Brooklyn Residence.

11

b.      KITROSER emerged from the Brooklyn Residence carrying a book bag (the "Book Bag").

c.      KITROSER placed the Book Bag in the trunk of the Car.

d.      KITROSER drove the Car a short distance and pulled over. RONEL PIERRE, the defendant, approached the Car, carrying a black bag ("Bag-1").

e.      PIERRE got into the Car and handed KITROSER Bag-1.

f.      Law enforcement agents approached the Car and spoke with KITROSER and PIERRE. KITROSER stated, in substance and in part, that (1) the Car was not his and (2) the Book Bag and Bag-1 were not his. PIERRE stated, in substance and in part, that (1) the Car was not his and (2) the Book Bag and Bag-1 were not his.

g. After both KITROSER and PIERRE disclaimed ownership of Bag-1 and the Book Bag, law enforcement agents opened Bag-1 and discovered large bundles of U.S. currency. The law enforcement agents opened the Book Bag and discovered two brick-shaped packages containing what appeared to be cocaine, weighing approximately two kilograms.

16.     I and other law enforcement agents have observed ROMAN KITROSER, the defendant, driving a BMW that is registered to an individual not named as a defendant herein ("Individual-1"). Based on my review of law enforcement databases, I have learned that Individual-1 is the listed tenant for an apartment located in the Manhattan Residence (the "Manhattan Apartment").

17.     On or about December 12, 2014, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge for the Southern District of New York, signed a

search warrant for the Manhattan Apartment. I and other law enforcement agents executed the search warrant and found, among other things, the following:

a.        Three speaker boxes, each containing seven kilograms of a white powdery substance that appeared to be cocaine, for a total of 21 kilograms. Field tests conducted on a sample of the substance confirmed the presence of cocaine.

b.        A bag containing what appears to be marijuana;

c.        Scales;

d.        A safe containing, among other things, approximately $55,000 in U.S. currency;

e.        A vacuum-sealed package containing over $100,000 in U.S. currency;

f.        Ledgers containing, among other things, tracking numbers for packages;

g.        A money counter;

h.        A prescription pill bottle bearing the name "Roman Kitroser";

i.        An autographed picture made out to "Roman Kitroser."

18.        On or about December 12, 2014, I and other law enforcement agents were present at the Manhattan Apartment in connection with the execution of the above-referenced warrant. I have spoken with another law enforcement agent, who in turn spoke with a security attendant for the Manhattan Residence (the "Attendant"). Based on my conversation with that other agent, I have learned, among other things, the following:

a.        On or about December 11, 2014, after the law enforcement agents arrived at the Manhattan Residence and after ROMAN KITROSER and RONEL PIERRE, the defendants, had been arrested, the Attendant received a call from Individual-1,

*the listed tenant for the Manhattan Apartment. Individual-1 informed the Attendant that an individual named "Jessy" would be arriving to remove things from the Manhattan Apartment. Individual-1 told the Attendant, in substance and in part, that "Jessy" should be permitted to enter and, if "Jessy" were permitted to enter, Individual-1 would "take care of" the Attendant.*

*b.      JESSY CASTILLO, the defendant, subsequently arrived at the Manhattan Apartment."*

## Natisha Aponte

*"10.   On or about December 8, 2014, I and other law enforcement agents conducted surveillance of the Brooklyn Residence. We observed, among other things, Natisha Aponte, the defendant entering the Brooklyn Residence carrying three brown cardboard boxes.*

*13.     I and other law enforcement agents have spoken with an employee of Con Edison, who told us, in substance and in part, that a utility account exists for an apartment in the Brooklyn Residence (the "Brooklyn Apartment") in the name of NATISHA APONTE, the defendant.*

*14.     On or about December 11, 2014, following the events described in paragraph 12 above, law enforcement agents conducted surveillance of the Brooklyn Residence. Based upon my conversations with some of those law enforcement agents, I have elarned they observed, among other things, the following:*

*a.      Natisha Aponte, the defendant, exited the Brooklyn Residence.*

*b.      Aponte entered the Truck.*

c.      *Aponte drove the Truck to the same block where Kitroser and Ronel Pierre, the defendant, had engaged in the above described exchange described in paragraph 12 above earlier that day.*

d.      *Aponte exited the truck and was approached by law enforcement agents."*

Thus while, Aponte's co-defendants Kitroser and Pierre are alleged in the Complaint to have been caught in the act – in the midst of an unlawful transaction wherein they were in actual possession of two (2) kilograms of cocaine and approximately $68,000 in cash as the lone occupants within the small confines of a motor vehicle parked on a public street - Aponte's actions in the Complaint surround otherwise lawful conduct (i.e. carrying three brown cardboard boxes, the possession of a Con Edison utility account as well as entering, driving and exiting a truck which contained no controlled substances). To clarify and repeat, the proverbial 'smoking gun' that exists in the Government's 21 U.S.C. §841(a)(1) prosecution of co-defendants Kitroser and Pierre does not exist against Aponte.

Thus, Aponte will be tangibly prejudiced and inflammatorily stigmatized for her arguably innocuous activities as a result of the Government's consolidation of them with the *per se* unlawful activities of third party co-defendants as described in §12 of the Complaint. The Government will accomplish this despite the incontrovertible fact that Aponte has never been found to be physical possession of any non-prescribed controlled substance or weapon during the course of the instant investigation.

Not only will a jury will be compelled to entertain these multiple complicated fact patterns - each relating to specific individual defendants – this will also occur within the context of a lengthy trial.

Furthermore, unlike most of her co-defendants, Ms. Aponte has no prior criminal convictions whatsoever and will likely suffer additional prejudice by virtue of being tried with Kitroser who possesses a significant criminal history which includes two (2) prior federal felony drug arrests.

### (4)      Possible Conflict Between Various Defense Theories or Trial Strategies:

A critical potential conflict between competing defense theories and trial strategies lies on the horizon of a consolidated trial of these four defendants; namely the identity of the *de facto* tenant of the Brooklyn Residence in which the following damning items were found pursuant to the Government's December 11, 2014 search warrant:

-nine firearms including three machine guns;

-two silencers;

-high-ammunition magazines;

-eight kilograms of cocaine;

-two kilograms of heroin;

-a kilo-press;

-large quantities of U.S. currency;

-money counters;      and

-approximately twenty cellular phones.

The prejudice associated with Aponte and Kitroser each respectively taking the position within one consolidated trial that the other was the *de facto* tenant of the Brooklyn Residence – and thus the individual in actual as opposed to constructive possession of both the controlled substances and firearms located therein cannot be overstated.

Aponte has already proffered to this Court that the contents of the Brooklyn Residence which she possessed an actual property interest in were limited to the contents of the suitcase which accompanied her from Las Vegas, Nevada to New York only one week prior to her arrest (Transcript of Detention Hearing Pg. 8, Lines 12-14).

Although the lease for the Brooklyn Residence being signed by Aponte as an accommodation to her boyfriend Kitroser's due to his lack of creditworthiness just two (2) short months prior to the DEA's execution of the search warrant for that premises, Aponte steadfastly proffered that she did not reside there and had only limited presence in the premises[2].

Aponte was instead a resident of the State of Nevada - maintaining her driver's license, place of employment and domicile there and not in New York. Notably, no controlled substances or U.S. currency were seized during the course of the search warrant executed by the Government at her actual residence in Las Vegas, Nevada.

Despite Aponte advancing a defense theory and trial strategy corresponding to her residency in Las Vegas, Nevada, the existence of the lease along with utility bills under her name as well as the appearance of certain woman's clothing and shoes at the Brooklyn Residence combine to create a material conflict with the defense theory and trial strategy likely to be advanced by Kitroser in this matter. We would be remiss if we failed to note that Kitroser has already disclaimed any property interest in the Car, the Book Bag and Bag-1 as described in §12 (f) of the Complaint.

---

[2] Not only has the Government not alleged any nexus whatsoever between Aponte and the Manhattan Residence, the Complaint all but concedes Kitroser was the *de facto* tenant of the Manhattan Residence notwithstanding the existence of a third party on its lease. The Manhattan Residence similarly contained controlled substances, scales, United States currency (approximately $155,000), a money counter and ledgers containing tracking numbers.

**(5)      Prejudice From Evidence Admitted Only Against Co-Defendants But Which**

**Is Inadmissible or Excluded as to a Particular Defendant:**

The irreparable prejudice from evidence admitted against Kitroser we believe inadmissible

or excluded as to Aponte is perhaps best evidenced by the following exchange between the Court

and the Office of the United States Attorney:

> *"The Court:*      *...[W]as there not reference to grenades or am I making that up?*
>
> *AUSA:*      *Yes, you're right, there were grenades recovered in connection with this*
>
> *case in a storage locker....*
>
> *The Court:*      *Grenades.*
>
> *AUSA:*      *Grenades."*
>
> Transcript Pg. 24 Line 23 –Pg. 25 Line 9

These grenades were not found in Aponte's storage locker nor in any storage locker the

Government has alleged was ever visited by Aponte[3].  We respectfully submit that Aponte's mere

appearance at the defense table with Kitroser contemporaneous with the Government's admission

of evidence relating to these grenades would prove ruinous to her defense.

---

[3] Even if the Court was to somehow find these grenades admissible as to Aponte, their very existence would nonetheless remain relevant to the determination of whether a severance was warranted in this matter (i.e. disparities in the amount and type of proof offered against the defendants, disparities in the type of proof offered against the defendants).

Consistent with the preceding discussion, we respectfully submit that an objective analysis of the operative Gallo factors militates strongly in favor of severing Natisha Aponte in the interests of justice.

**POINT II**

**MOTION TO SUPPRESS ANY EVIDENCE OBTAINED DURING THE WARRANTLESS SEARCH OF NATISHA APONTE AT IN BROOKLYN, NEW YORK ON DECEMBER 11, 2014 ALONG WITH THE FRUITS THEREOF**

The Fourth Amendment specifically prohibits "*unreasonable searches and seizures*" and requires that "*no warrants shall issue, but upon probable cause, supported by Oath.*" U.S. Constitution, Amendment IV.

Thus, the Government must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure (see, e. g., Katz v. United States, 389 U. S. 347 (1967); Beck v. Ohio, 379 U. S. 89, 96 (1964); Chapman v. United States, 365 U. S. 610 (1961)). The Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances and, in making that assessment, it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "*warrant a man of reasonable caution in the belief*" that the action taken was appropriate? Cf. Carroll v. United States, 267 U. S. 132 (1925); Beck v. Ohio, 379 U. S. 89, 96-97 (1964).

Anything less invites intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches of government agents. As a result, the Courts have consistently

refused to sanction such conduct by the Government. See, e. g., <u>Beck v. Ohio</u>, supra; <u>Rios v. United States</u>, 364 U. S. 253 (1960); <u>Henry v. United States</u>, 361 U. S. 98 (1959). Simple " `*good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be `secure in their persons"* only in the discretion of the police.*" <u>Beck v. Ohio</u>, supra, at 97.

Given the Fourth Amendment's general proscription against unreasonable searches and seizures, the Government bears the burden of justifying the warrantless search in this matter.

To clarify and repeat, when - as here - the Government seeks to rely upon consent to justify the lawfulness of a search, they have the burden of proving that the consent was, in fact, freely and voluntarily given. <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968). Consent must result from an individual's free and unconstrained choice rather than a mere acquiescence in a show of authority. <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968), <u>Amos v. United States</u>, 255 US 313 (1921); <u>Johnson v. United States</u>, 333 US 10 (1948); see also <u>United States v. Wilson</u>, 11 F 3rd 356, 351 (2nd Cir. 1993); <u>United States v. Marra</u>, 40 F. 2d 271 (W.D.N.Y. 1930). Indeed, the Government bears a heavy burden of proving the voluntariness of a purported consent. <u>Bumper v North Carolina</u>, <u>Id</u>, 548-549.

Consent to a search is voluntary only when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle. <u>Schneckloth v Bustamonte</u>, 412 US 218, 225-228 (1973). The Government must prove that any consent to a search was voluntary by a preponderance of the evidence. <u>United States v. Snype</u>, 441 F. 3d 119, 131 (2nd Cir. 2006); <u>United States v. Isiofia</u>, 370 F. 3rd 226, 230 (2nd Cir. 2004).

On December 11, 2014, Aponte was driving a vehicle on a public street. After parking and exiting the vehicle that she was the lone occupant of, Aponte was approached by multiple DEA agents and surrounded. Notwithstanding the fact she had committed no moving violation or committed any other crime[4], Aponte felt unable to escape their confrontation. The DEA agents began abruptly questioning Aponte – attempting to intimidate her in the process. Although they requested consent to search her bag, she did not provide voluntary consent (see Affidavit of Natisha Aponte - Exhibit A).

Despite this, the DEA agents seized Aponte's bag and proceeded to scrutinize the entirety of its contents.

In the absence of a search warrant, the DEA agents have been reduced to seeking to manufacture voluntary consent in hindsight. The record is however devoid of any objective evidentiary materials confirming Aponte's voluntary provision of consent (e.g. her signed authorization, her video or audio recorded consent, etc.) notwithstanding the burden of proof to justify this warrantless intrusion on her falling squarely upon the Government.

The DEA agents had ample opportunity to secure a warrant authorizing Aponte's search and subsequent seizure of any responsive items uncovered. The record reflects they failed to do so. Notably, the case agents involved in this same investigation demonstrated themselves familiar with the warrant process on the same day – submitting and receiving a search warrant from the

---

[4] Indeed, the DEA agents were previously uncertain of the identity of the individual contemporaneously operating the vehicle. They had instead been tracking the GPS coordinates of Kitroser's vehicle as opposed to specifically following Aponte based on some credible suspicion she was presently engaged in the commission of a crime.

Honorable Vera Scanlon, United States Magistrate Judge for the Eastern District of New York for an apartment alleged to have been involved in the identical conspiracy (i.e. the Brooklyn Residence). Aponte and her purse were entitled to this very same constitutional safeguard.

Accordingly, the contents of the search of Aponte in Brooklyn, New York on December 11, 2014 pursuant to this defective warrantless search should be suppressed (i.e. United States currency in the approximate amount of $14,000) along with any fruits thereof (i.e. all statements made to DEA agents) (see e.g. Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920) (evidence gathered with the assistance of illegally obtained information must be excluded from trial).

Of additional relevance, Aponte was in *de facto* custody at the time of this search. As such, any contemporaneous statements allegedly made by her that the Government intends to offer at trial were similarly extracted in violation of her constitutional rights. Miranda v. Arizona, 384 U.S. 436 (1966); Jackson v. Denno, 378 U.S. 368 (1964). Such statements should thus be suppressed on the grounds that they were obtained (1) while Aponte was in custody and in response to interrogation by the DEA prior to being advised of her constitutional rights; (2) without Aponte's knowing and intelligent waiver of such rights and (3) in violation of Aponte's rights to counsel under the United States Constitution.

Consistent with the foregoing, we submit that the warrantless search of Aponte in Brooklyn, New York on December 11, 2014 was unreasonable and thus the entirety of the evidence seized inadmissible. Given the absence of the DEA agents' procurement of a warrant and concomitant absence of her voluntary consent, this Court is respectfully urged to suppress all the evidence seized from Aponte at such time.

## POINT III

### MOTION TO SUPPRESS ANY EVIDENCE OBTAINED DURING THE WARRANTLESS SEARCH OF NATISHA APONTE AT JFK AIRPORT ON JULY 15, 2012 ALONG WITH THE FRUITS THEREOF

As detailed above, a finding of probable cause is required prior to the issuance of a search warrant in light of the Fourth Amendment's prohibition on unreasonable searches and seizures. In circumstances where – as here - no warrant exists, the burden of proof to justify a warrantless search lies with the Government.

On July 15, 2012 Aponte arrived at JFK Airport in Queens, New York for purposes of travel to Los Angeles, California. This was notably a domestic flight - not international travel – and thus there was no corresponding obligation to declare currency in her possession in excess of $10,000.

Aponte did not attempt to conceal the funds in her checked baggage nor on her person. They were in her carry-on bag handed to TSA personnel at the security checkpoint[5]. TSA returned the carry-on bag – currency intact – to Aponte and she proceeded to her gate.

---

[5] Aponte has been historically employed in Las Vegas, Nevada as an adult entertainer at a renowned gentlemen's club. This is a lucrative position where she is predominantly compensated in the form of cash tips from affluent patrons.

Despite being released by the TSA however, agents of the DEA subsequently appeared at the gate approximately 30 minutes later for purposes of confronting Aponte. As set forth in the attached Affidavit of Natisha Aponte (Exhibit A), the DEA Agents abruptly escorted her to a windowless room and instructed her to sit down. While confined in this room, she was repeatedly questioned about the contents of her bag, her travel itinerary and her employment amongst other things. The DEA agents requested independent consent to conduct their own search of her bag. Despite the fact that she did not voluntarily provide consent, they proceeded to rifle through it in her presence in the absence of any warrant.

The DEA had no probable cause to believe that Aponte engaged in any criminal offense and the mere possession of the currency in question was no crime. Indeed, the record reflects that Aponte was not arrested in connection with this incident.

In the event the DEA agents were able to articulate any legitimate probable cause to conduct their own search of Aponte's bag, they had ample opportunity to secure a warrant authorizing same. The record reflects they failed to do so.

Here too, we note the conspicuous absence of any objective memoranda corroborating Aponte's provision of voluntary consent to the search of her bag (e.g. a signed authorization, a video or audio recorded consent, etc.).

Accordingly, the contents of the search of Aponte pursuant to this defective warrantless search should be suppressed (i.e. United States currency in the amount of $136,900) along with any fruits thereof (i.e. statements allegedly made to DEA agents) (see e.g. Silverthorne Lumber Co. v.

24

<u>United States</u>, 251 U.S. 385 (1920) (evidence gathered with the assistance of illegally obtained information must be excluded from trial).

Consistent with the foregoing, we submit that the warrantless search of Aponte at JFK Airport on July 15, 2012 was unreasonable and thus the evidence seized inadmissible. Given the absence of the DEA agents' procurement of a warrant and concomitant absence of her voluntary consent, this Court is respectfully urged to suppress all the evidence seized from Aponte at such time.

**POINT IV**

**<u>MOTION TO INCORPORATE AND ADOPT MOTIONS OF CO-DEFENDANTS AND LEAVE TO MAKE FURTHER MOTIONS</u>**

The Defense, pursuant to Rule 12 of the Federal Rules of Criminal Procedure, respectfully moves this Court for permission to incorporate and adopt each and every motion filed by all co-defendants in this case. This motion is intended to include all motions filed during the instant matter. The defendant reserves the right to object to any motion not intended to be adopted or incorporated by this motion.

The Defense has endeavored to encompass within this motion all forms of pre-trial relief that may properly be requested at this time. Should this case assume a different posture at a later date due perhaps to availability or unavailability of evidence, the Court is respectfully asked to grant leave to make such further motions as may seem appropriate at a future date.

## **CONCLUSION**

Wherefore, your Affirmant respectfully pray that Orders issue granting to Defendant Aponte, the relief sought within all instant motions together with such other and further relief as to this Court seems just and proper.

Dated: July 9, 2015
     New York, New York

                               Respectfully Submitted,

                               /j.rapawy/

                               John Rapawy, Esq.
                               90 Broad Street, 15th Floor
                               New York, New York 10004
                               Phone (212) 668-8400

### TABLE OF AUTHORITIES

| | |
|---|---|
| Amos v. United States, 255 US 313 (1921) | 20 |
| Beck v. Ohio, 379 U. S. 89 (1964) | 19, 20 |
| Bumper v. North Carolina, 391 U.S. 543 (1968) | 20 |
| Carroll v. United States, 267 U. S. 132 (1925) | 19 |
| Chapman v. United States, 365 U. S. 610 (1961) | 19 |
| Federal Rule of Criminal Procedure 14(a) | 6 |
| Henry v. United States, 361 U. S. 98 (1959) | 19 |
| Jackson v. Denno, 378 U.S. 368 (1964) | 22 |
| Johnson v. United States, 333 US 10 (1948) | 20 |
| Katz v. United States, 389 U. S. 347 (1967) | 19 |
| Miranda v. Arizona, 384 U.S. 436 (1966) | 22 |
| Rios v. United States, 364 U. S. 253 (1960) | 19 |
| Schneckloth v Bustamonte, 412 US 218 (1973) | 20 |
| Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920) | 22, 24 |
| United States v. DeVillio, 983 F.2d 1185 (2d Cir. 1993) | 6 |
| United States v. Gallo, 668 F. Supp. 736 (E.D.N.Y. 1987) | 7, 18 |
| United States v. Isiofia, 370 F. 3rd 226 (2nd Cir. 2004) | 20 |
| United States v. Marra, 40 F. 2d 271 (W.D.N.Y. 1930) | 20 |
| United States v. Snype, 441 F. 3d 119 (2nd Cir. 2006) | 20 |
| United States v. Werner, 620 F.2d 922 (E.D.N.Y. 1980) | 6 |
| United States v. Wilson, 11 F 3rd 356 (2nd Cir. 1993) | 20 |
| US Constitution, Amendment IV | 19 |
| Zafiro v. United States, 506 U.S. 534 (1993) | 6 |