UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | 15 Cr. 19-2 (KPF) |
| NATISHA APONTE, | **ORDER** |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

    Defendant Natisha Aponte was sentenced in March 2016 principally to a term of 120 months' imprisonment followed by five years' supervised release. (Dkt. #108 (judgment)).  She began her term of supervised release in June 2022, and is being supervised in the Middle District of Florida, where she resides.  On February 27, 2025, the Probation Office filed a Request for Court Action in which it requested early termination of Ms. Aponte's term of supervised release, citing her stable residence and employment, lack of need for drug treatment, and compliance with her conditions of supervised release. (*See* Request for Court Action dated February 27, 2025 ("Request")).  For the reasons set forth in the remainder of this Order, the request is denied without prejudice to its renewal.

    By way of background, Ms. Aponte was part of a wide-ranging narcotics conspiracy that maintained apartments/stash houses in both Manhattan and the Bronx.  (*See* Presentence Investigation Report ("PSR" (Dkt. #95)) ¶¶ 10-35). Ms. Aponte herself conspired to distribute "approximately 69.5 kilograms of cocaine, 38.5 grams of crack, 986.2 grams of MDMA, 1.34 kilograms of marijuana, and 6.36 kilograms of heroin over the course of the offense." (*Id.*

¶ 32). In addition, Ms. Aponte was "responsible for the possession of nine firearms during the course of the offense, including three machine guns" (*id.*), and was once stopped at John F. Kennedy International Airport with "$136,900 in cash in a vacuum-sealed pouch contained within her carry-on luggage," which she ultimately abandoned (*id.* ¶ 11). (*See also id.* ¶ 24 (consenting to search by law enforcement of bag on her person, which search revealed $14,909 in U.S. currency); *id.* ¶ 12 (arriving at car dealership in December 2013 to pick up package containing three kilograms of heroin, but leaving without package because of suspicions of law enforcement involvement)). At the Brooklyn apartment where Ms. Aponte resided part-time with the head of the charged conspiracy, Roman Kitroser, law enforcement recovered

> nine firearms, one of which showed evidence of discharge, and three of which appeared to be three machine guns; two silencers; high-ammunition magazines; approximately eight kilogram-sized packages containing cocaine; two packages containing approximately 2 kilograms of heroin; a large press used to form loose narcotics into kilogram-sized bricks, commonly referred to as a "kilo press"; large quantities of U.S. currency totaling more than $889,000; three money counters; approximately 21 cellular phones; a laptop, which revealed that more than 140 UPS packages had been tracked between California and New York, with each weighing between 9 and 60 pounds; identification cards that displayed photographs of [ROMAN] KITROSER, but reflected different names; papers bearing the name "NATISHA APONTE," including U.S. mail; women's clothing and shoes; and prescription pill bottles bearing the name "ROMAN KITROSER."

(*Id.* ¶ 25). At the Manhattan apartment, law enforcement recovered

> three speaker boxes, each containing 7 kilograms cocaine (a total of 21 kilograms); a bag containing 2.35

2

> kilograms of marijuana; scales; a safe containing approximately $55,000 in U.S. currency; a vacuum-sealed package containing more than $100,000 in U.S. currency; ledgers containing tracking numbers for packages; three money counters; electronics (two laptops, one iPad, and five cell phones); fake identification cards; tax documents for KITROSER and APONTE; a prescription pill bottle bearing the name "ROMAN KITROSER"; and an autographed picture made out to "ROMAN KITROSER."

(*Id.* ¶ 27). And at the couple's Las Vegas residence, law enforcement recovered a money counter. (*Id.* ¶ 30).

In December 2014, the Government filed a criminal complaint against Ms. Aponte, Mr. Kitroser, and others, charging them with narcotics and firearms offenses. (Dkt. #1). Ms. Aponte was arrested on December 11, 2014, and detained. (Dkt. #5). In January 2015, the Grand Jury returned an indictment charging Ms. Aponte, Mr. Kitroser, and others with similar narcotics and firearms offenses. (Dkt. #14 ("Indictment")). On November 4, 2015, Ms. Aponte entered a plea of guilty to the narcotics conspiracy charged in Count One of the Indictment pursuant to a plea agreement with the Government in which the parties stipulated to a sentencing range under the United States Sentencing Guidelines (the "Guidelines") of 135 to 168 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment. (PSR ¶ 5; *see also* Dkt. #85 (plea transcript)).

The Court sentenced Ms. Aponte on March 16, 2016, to the mandatory minimum term of 120 months' imprisonment, followed by the mandatory minimum term of five years' supervised release. (Dkt. #108 (judgment); Dkt.

#111 (sentencing transcript)).  In explaining the reasons for the sentence given, the Court noted in relevant part:

> I will cut to the chase and tell the parties that I am going to impose the mandatory minimum sentence of 120 months.  I will explain why.  I do think there are some significant issues with Ms. Aponte's childhood.  I accept, because there is no reason not to, the recitation that [defense counsel] gave me about the various times that she has been abandoned by people close to her.
>
> ***
>
> I am also mindful of the sheer scope of this conspiracy.  There [is] an extraordinary amount of drugs involved here of many different types.  There are firearms.  There was a kilogram press in the apartment, which in many years of involvement with narcotics-related cases I've never seen before.  More than a million dollars in narcotics proceeds.  And I accept the government's point that when Ms. Aponte was stopped at the airport and abandoned the money, on some level she was extending the life of the conspiracy.
>
> ***
>
> Considering all of that, I think 120 months is sufficient but not greater than necessary to comport with the purposes of sentencing.

(Dkt. #111 at 29-30).

The Court understands that Ms. Aponte was released from custody in June 2022, and commenced her term of supervised release on June 17, 2022. (Request 1).  As noted, the Probation Office submitted its request for early termination on February 27, 2025, citing Ms. Aponte's stable housing and employment, lack of substance abuse, and compliance with the conditions of supervised release.  (*Id.* at 1-2).

## APPPLICABLE LAW

Section 3583(e)(1) of Title 18 of the United States Code empowers a court to terminate a term of supervised release at any time after the expiration of one year of that term so long as the court determines that such action is warranted by the conduct of the defendant and is in "the interest of justice." 18 U.S.C. § 3583(e)(1). The court is required to consider the factors set forth in Sections 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). *Id.* § 3583(e). Put somewhat differently, the Court is required to consider the factors in Section 3553(a) that "bear on 'deterrence, public safety, rehabilitation, proportionality, and consistency.'" *United States* v. *Gonzalez*, No. 94 Cr. 134 (JSR), 2015 WL 4940607, at *1 (S.D.N.Y. Aug. 3, 2015) (quoting *United States* v. *Lussier*, 104 F.3d 32, 35 (2d Cir. 1997)). The United States Sentencing Guidelines encourage courts "to exercise this authority in appropriate cases." U.S.S.G. § 5D1.2, comment. n.5 (November 2024 manual).

"Early termination 'is not warranted as a matter of course,'" *United States* v. *Wheeler*, No. 20 Cr. 492 (GHW), 2023 WL 4561591, at *1 (S.D.N.Y. July 17, 2023) (quoting *United States* v. *Fenza*, No. 03 Cr. 921 (ADS), 2013 WL 3990914, at *2 (E.D.N.Y. Aug. 2, 2013)). However, courts have recognized that "changed circumstances" may make it appropriate for a court to reduce a term of supervised release. *Lussier*, 104 F.3d at 36. Those changed circumstances can include the "exceptionally good behavior by the defendant" on supervised release, which may "render a previously imposed term or condition of release ... too harsh or inappropriately tailored to serve the general punishment goals of

5

section 3553(a)." *Id.* However, "exceptionally good behavior" is not established simply by complying with the terms of supervised release. *See Fenza*, 2013 WL 3990914, at * 2 ("Full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release and does not warrant early termination."). Conversely, new or changed circumstances are not required so long as a court considers the relevant 18 U.S.C. § 3553(a) sentencing factors. *See United States* v. *Parisi*, 821 F.3d 343, 347 (2d Cir. 2016).

Upon consideration of the applicable factors under 18 U.S.C. § 3553(a), the Court declines to terminate Ms. Aponte's supervised release at this time. The nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), Ms. Aponte's history and characteristics, *id.*, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6), counsel against early termination. To be clear, the Court is encouraged by Ms. Aponte's progress while on supervised release, particularly the stability of her housing and employment situations, the degree of family support that she has received, and her consistent compliance with the terms and conditions of supervised release. The Court has also taken seriously the fact that the request for early termination was filed by the Probation Office, which is in a prime position to gauge Ms. Aponte's progress on supervised release, and which is to be commended for the assistance it has provided to Ms. Aponte. That all said, the Court remains concerned about the egregiousness of the underlying criminal

conduct and the significant role that Ms. Aponte played in it.  In addition, the Court varied downwardly from the applicable Guidelines range at sentencing precisely because it contemplated that Ms. Aponte would serve the entirety of her supervised release term.  Finally, the Court has received no indication that the conditions of Ms. Aponte's supervised release have imposed unusual burdens on her or otherwise interfered with her reentry into society.  For all these reasons, the Court believes that terminating Ms. Aponte's supervised release at this juncture — approximately halfway through her term of supervised release — would not adequately "serve the general punishment goals of section 3553(a)." *Lussier*, 104 F.3d at 36.  However, the Court emphasizes that its decision today is without prejudice to the Probation Office or Ms. Aponte bringing a renewed application for early termination of supervised release in the future.

Accordingly, the Court DENIES without prejudice the Probation Office's request for early termination of Ms. Aponte's supervised release.  The Court directs the Probation Office to transmit a copy of this Order to the Probation Office for the Middle District of Florida and to Ms. Aponte.

SO ORDERED.

Dated: March 6, 2025
       New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge